**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | |
|---|---|
| **Prime Time Mortgage, Co.,** *et al.*, | |
| Plaintiffs, | Case No. 3:03-cv-337 |
| v. | |
| **Flagstar Bank, FSB,** *et al.*, | Judge Thomas M. Rose |
| Defendants. | |

**ENTRY AND ORDER GRANTING FLAGSTAR BANK, FSB'S MOTION FOR PARTIAL SUMMARY JUDGMENT.**  (Doc. 53.)

Pending before the Court is Flagstar Bank, FSB's Motion for Partial Summary Judgment. Doc. 53. Plaintiffs, Prime Time Mortgage and Brett Hoffacker assert that Defendant Flagstar Bank[1] defamed the good character of Prime Time and Hoffacker by reporting to the Mortgage Asset Research Institute ("MARI") that Prime Time and Hoffacker had misrepresented the appraised value of property located at 724 Leland Avenue in Dayton, Ohio, and failed to report a "flip" of the property. Flagstar responds that its report to MARI enjoyed qualified immunity. Flagstar further counters with a claim of its own: an assertion that Prime Time and Hoffacker breached a contract with Flagstar. Because a review of the evidence admissible at trial read in the light most favorable to Prime Time and Hoffacker reveals that Flagstar's statement to MARI was qualifiedly immune and

---

[1] Mortgage Asset Research Institute was also named as a defendant in the complaint, but claims against MARI have been dismissed with prejudice after MARI removed the listing from its database. Doc. 8.

because Prime Time and Hoffacker failed to fulfill their warranties to Flagstar, the Court will grant Flagstar's motion.

## I. Background

Plaintiff Prime Time Mortgage Company is a broker of residential mortgage loans. Prime Time employs a number of loan officers, including Co-Plaintiff Brett Hoffacker, who solicit and process loan applications. See Verified Complaint, doc. 1 at ¶ 1; Amended Counterclaim doc. 41 at ¶ 2; Answer to Amended Counterclaim doc. 42 at ¶ 1. Defendant Flagstar Bank, FSB, is a federally-chartered bank engaged, *inter alia*, in the business of providing residential mortgage loans. Prime Time has contracted with Flagstar to perform loan origination services on residential mortgage loans placed with Flagstar. See Amended Counterclaim, doc. 41 at ¶ 1; Answer to Amended Counterclaim doc. 42 at ¶ 1.

Prime Time and Flagstar entered into their contract, entitled "Wholesale Lending Broker Purchase Agreement," on April 4, 2001. Amended Counterclaim, doc. 41 at ¶ 3; Answer to Amended Counterclaim, doc. 42 at ¶ 2. The agreement allowed Prime Time to submit mortgage loan applications to Flagstar for purchase, subject to Flagstar's approval. See Agreement at §§2.1 and 2.2, Amended Counterclaim at Ex. A. Under the agreement, Prime Time, in preparation for the submission of a mortgage loan to Flagstar, was to "obtain appraisal, credit, and all other documents" required by Flagstar. *Id.* at §2.2(b); Amended Counterclaim, doc. 41 at ¶ 4; Answer to Amended Counterclaim doc. 42 at ¶ 3. These "Mortgage Loan Documents" are then submitted to Flagstar for approval. Flagstar, in turn, may, at its sole discretion, issue a "commitment" accepting purchase of that mortgage. Agreement at §2.2(c).

In practice, Flagstar issued commitments by means of an automated underwriting system. Loan applications were oftentimes rejected because the appraised value of the property was too low or too high. Tabib Aff. at ¶ 5. After reviewing an application, a lender typically will issue a conditional approval, listing a number of conditions or "stipulations" for final approval of the loan. The loan officer ensures that each of these conditions is met and submits documentation of the same to the lender. Once all such conditions are met, a lender typically issues a final approval letter. Tabib Aff. at ¶ 5; Tabib Dep. at 42, lines 9-25, 43, lines 1-5; see generally Terrasi Dep. at 17 -21.

The Wholesale Lending Broker Purchase Agreement, however, requires that Prime Time warrant the truth and accuracy of all "Mortgage Loan Documents":

> *Seller [Prime Time] warrants that all Mortgage Loan Documents submitted by Seller for each Mortgage Loan are in every respect valid and genuine, being what they [pur]port to be and all information submitted in each Mortgage Loan Document is true and accurate.* The Mortgage Loan Documents have been duly executed by Borrower, acknowledged and sent for recording; the Borrower is the true and only obligor on the Mortgage Loan and is the real party in interest thereon, and there is no verbal understanding or written modification which would affect the terms of the Note or Mortgage.

§ 3.1(a). "Mortgage Loan Documents" are defined as "the Closing Package and any and all other documents creating, evidencing, or securing a Mortgage Loan, which are required to be maintained or prepared by Seller pursuant to the Agreement or the Guide." Art. I. "Closing Package," in turn, is defined as "the group of documents are other information or materials as defined in the Guide which must be delivered to Flagstar under the terms set forth herein." *Id.* This includes the appraisal. Tabib Dep. at 211.

Prime Time further warranted the loan applications' compliance with industry standards:

> Seller understands Flagstar intends to sell the Mortgage Loans to investors in the secondary market. Seller represents, covenants and

>  warrants that in submitting Mortgage Loans to Flagstar that it is in full compliance with all pertinent requirements of Fannie Mae, Freddie Mac, Ginnie Mae, FHA and VA.

§ 3.1(j).  Prime Time even warranted the loans' marketability:

> Seller has no knowledge of any circumstance or condition with respect to any Mortgage Loan, Mortgage Property, the Borrower, or the Borrower's credit standing that can be reasonably expected to cause private institutional investors, Fannie Mae, Freddie Mac, or Ginnie Mae to regard the loan as an unacceptable investment, cause the Mortgage Loan to become delinquent or adversely effect the value or marketability of the Mortgage Loan.

§ 3.1(k).

Finally, the agreement provides that Prime Time shall repurchase loans it sold to Flagstar when it violates these duties and warranties in a material fashion:

> Repurchase of Mortgage Loan by Seller.  Seller agrees that upon written request Seller shall immediately repurchase, at the Repurchase Price, any Mortgage Loan sold to Flagstar pursuant to this Agreement for any of the following reasons:
>
> * * *
>
> (b)   Flagstar reveals any evidence of fraud in the origination and closing of the Mortgage Loan by i.) the Seller or its employees, directors, officers, agents and independent contractors (including without limitation, sellers or brokers of the Seller); or ii.) the Borrower.
>
> * * *
>
> (d)   Seller fails to observe or perform or breeches in any material respect any of the representations, warranties or agreements contained in this Agreement, the Guide, or Agency guidelines with respect to a particular Mortgage Loan.

§ 5.1.

One document included in every "Loan Package" is an appraisal of the subject property. This document is prepared by a real estate appraiser licensed by the State of Ohio. Licenced appraisers are required to follow what are referred to as Uniform Standards of Professional Appraisal Practice ("USPAP"). Ohio Rev. Code § 4763.13(A). Compliance with USPAP is also a standard for appraisers in the industry, Tabib Dep., 134-35, and is required by the Federal National Mortgage Association. *Id.*, and Frey Dep., 19. USPAP requires that an appraisal report "flips" by noting prior sales of a property that have occurred within the prior 12 months. Frey Dep., 22-23. Another USPAP standard is that the appraisal must describe the methodology used for calculating the "cost to construct" calculation for valuing the Property. Frey Dep., Ex. P.

On or about March 12, 2001, Buzz Properties, Inc., a corporation that buys and sells residential property in the greater Dayton, Ohio, area, entered into a contract to purchase the property at 724 Leland Avenue, Dayton, Ohio, from Household Realty Company for $11,500.00. See Thomas Dep. at Ex. CC. The closing occurred on April 13, 2001. See Thomas Dep. at Ex. BB. Household had acquired the Leland property through foreclosure, and had previously listed it for $24,900.00. See Frey Dep. at Ex. LL. Buzz Properties, however, submitted a low bid which, after a wait of several months, Household finally accepted. Thomas Dep. at 49, lines 3-10; *id.* at Ex. CC.

Also at this time, Buzz Properties began rehabbing the Leland property for resale. This work may have begun as soon as Household accepted the contract, even prior to closing. *Id.* at 91, lines 9-25, 92, lines 1-8. At some point, a man named James Hockenberger contacted Kevin Thomas, the owner of Buzz Properties, regarding the purchase of rehabbed properties as a possible investment vehicle. Hockenberger was acting on behalf of William Clemens, a coworker of his at a car dealership. Apparently, the two were acting as business partners but, because of Hockenberger's

bad credit, they agreed to purchase the properties in Clemens' name. See generally, *id.* at 31-34, esp. 33, lines 1-6.

As a result of these contacts, Buzz Properties entered into a contract with Clemens to sell the Leland property to him for $59,000. *Id.* at 65, lines 12-25, 66, lines 1-4. Clemens initially attempted to obtain financing through another mortgage broker. Apparently, that mortgage broker identified only as "Jessica/SBD" contacted Yvonne Frey, a state-certified real estate appraiser, and ordered a real estate appraisal. See Tabib Dep at Ex. P, doc. 59, Ex. J. Frey, however, valued the Leland property at only $54,300 and the deal fell through. Thomas Dep. at 66, lines 1-20. After the original deal on the Leland property fell through, Clemens purchased the real estate appraisal prepared by Frey, and asked that it be assigned to Prime Time. Tabib Dep. at 45, lines 13-45; Hoffacker Dep. at 42, lines 10-25.

Thomas then sent Clemens to Hoffacker, with whom he was already acquainted. Hoffacker Dep. at 18, lines 3-14; Thomas Dep. at 63, lines 4-15. Thomas arranged a luncheon meeting between the two, after which Clemens used Hoffacker as mortgage broker on a number of purchases of investment properties. See Hoffacker dep. at 26-32, esp. 31, lines 4-14. Thereafter, sometime in late May 2001, Clemens retained Hoffacker to act as mortgage broker on the purchase of the Leland property and four other investment properties: 227 Niagara Avenue, Dayton Ohio; 233 Volkenand Avenue, Dayton, Ohio; 542 Forest Avenue, Dayton, Ohio; and 684 Brooklyn Avenue, Dayton, Ohio. Hoffacker Dep. at 38, lines 8-11, 42, lines 6-9.

Hoffacker collected information from Clemens regarding his financial status, prepared five separate loan applications, one for each of the five investment properties. On May 31, 2001, he submitted these applications to five different lenders. See Tabib Dep at Exs. M, R, S, T and U;

Hoffacker Aff. at ¶ 8.  Hoffacker submitted the loan application for 724 Leland Avenue to Flagstar, a lender with whom Prime Time regularly conducted business, seeking a loan secured by an adjustable rate note.  See Tabib Dep. at Ex. M, Doc. 59, Ex. B.  On June 6, 2001, Prime Time received a "Wholesale Commitment Letter" from Flagstar, approving a loan to Clemens upon satisfaction of certain conditions including submitting additional documents including an appraisal.  Hoffacker Aff. at ¶ 10; see Tabib Dep. at Ex. N, Doc. 59, Ex. C.

Thereafter, and in conformity with the Wholesale Commitment Letter, Hoffacker submitted several documents to Flagstar in support of this loan, including the real estate appraisal that Clemens had previously obtained from Frey.  Hoffacker Aff. at ¶ 11(g); see Tabib Dep. at Ex. P Doc. 59, Ex. L.

On June 21, 2001, before Hoffacker has resubmitted the Leland loan application, Clemens closed on the Niagara Property, another of the real estate purchases that Hoffacker was handling for him.  At that closing, Clemens made a down payment of $18,521.31.  Hoffacker Aff. at ¶ 12; see Tabib Dep. at Ex. R-1, Doc. 59, Ex. M.  Clemens financed $48,600, payable back over 30 years at an initial rate of 10% APR; his payment for at least the first two years was $484.40 per month.  See Hoffacker Dep. at ¶ 12, Doc. 59, Ex. M.

On June 27, 2001, Hoffacker resubmitted Clemens' loan application to Flagstar, this time seeking a fixed-rate note rather than an adjustable rate note.  Rather than retyping the entire loan application, Hoffacker simply resubmitted the previously-prepared loan application, neglecting to add the investment property at 227 Niagara Avenue as a liability.  Hoffacker Aff. at ¶ 13; Hoffacker Dep. at 56, lines 1-12.

That same day, June 27, 2001, Prime Time received a second "Wholesale Commitment Letter" from Flagstar, approving the loan to Clemens under new terms, again upon satisfaction of certain conditions. Hoffacker Aff. at ¶ 14; see Tabib Dep. at Ex. N-1, Doc. 59, Ex. O. On July 6, 2001, Clemens closed on the purchase of the Leland property from Buzz Properties for $54,000.00. Clemens made a down payment of $9,361.63, and financed $48,600.00, payable back over 30 years at an initial rate of 8.25% APR; his payment was $365.12 per month. See Hoffacker Dep. at ¶ 15, Doc. 59, Ex. P-1, P-2.

Nearly two years later, on June 27, 2003, Patricia Engstrom, an auditor for Flagstar, reviewed the mortgage loan documents for the Clemens loan. She noted that the appraisal violated a USPAP standard in that it did not mention that the property had been sold within twelve months of Clemens' loan application. She investigated further and a new appraisal of the property valued it at $20,000. Engstrom wrote to Prime Time, claiming that Prime Time had misrepresented the value of the Leland property, that Prime Time had engaged in a fraudulent "property flip," and demanding that Prime Time repurchase the loan. See Tabib Aff. at ¶ 9, Doc. 59, Ex. R. Tabib subsequently contacted Engstrom regarding this demand. She asserted that during a random audit, Flagstar had determined that, since the property had been bought and sold within six months, it was flagged as a potential "property flip" and that new appraisal valued the land at $20,000.00, indicating to Flagstar the possibility that the appraisal used by Prime Time was fraudulent. Tabib Aff. at ¶ 10; Tabib Dep. at 142, lines 4-20.

It was later noted that the appraisal violates another USPAP standard. Even though the appraisal contains a "cost to construct" calculation for valuing the 724 Leland property, it does not

describe the methodology for this calculation.  Frey Dep., Ex. P.  Prime Time did not repurchase the property.

Sometime after June 27, 2003 and before July 8, 2003, Flagstar reported the Clemens Loan to MARI.  Tabib Dep., 76 & Ex. J.  The report stated:

> MISREPRESENTATION OF APPRAISED VALUE: ORIGINAL APPRAISAL STATED MARKET VALUE WAS $54,000. REVIEW APPRAISAL STATED VALUE WAS $20,000.
>
> PROPERTY FLIP: SUBJECT SOLD 1/26/01 FOR $18,000 AND 7/6/01 FOR $54,000.

Doc. 1, ¶19 & Ex. D.  The MARI Report states that Hoffacker was the loan officer on the loan and that Prime Time was the mortgage broker.  *Id.*

One element that Flagstar would have to prove as a part of the qualified privilege it claims is the existence of an interest to be upheld that warrants Flagstar's publication of this statement to MARI.  Flagstar asserts that it annually suffers substantial losses due to mortgage fraud.  Daly Decl., 9.  MARI maintains a database of incidents of suspect mortgage transactions for its subscribers.  *Id.* at ¶10.  Subscribers to MARI include secondary market agencies, such as Fannie Mae and Freddie Mac, as well as mortgage lenders and insurers.  *Id.* at ¶11.  Subscribers share and obtain information on MARI regarding mortgage professionals with whom they do business in an effort to prevent further fraud.  *Id.*  Access to MARI is limited to mortgage industry professionals who subscribe to the service.  *Id.*  Flagstar and the other mortgage lenders who utilize MARI share the common interest of reporting those who engage in suspect transactions, in order to discourage fraud.  *Id.* at ¶12.  Flagstar submits reports to MARI regarding incidents of suspicious transactions in the ordinary course of its business.  Daly Decl., ¶13.

Clemens failed to pay the Clemens Loan and it went into default. Daly Decl., ¶8. Flagstar commenced foreclosure proceedings and Clemens filed for bankruptcy. *Id.* Flagstar eventually obtained relief from stay and completed the foreclosure. *Id.* On December 3, 2004, the Leland property was sold for $20,000. *Id.* Flagstar thus reasons it has sustained damages. The amount is calculated by subtracting the net sale proceeds from the balance on the Clemens Loan, there is a deficiency balance of $39,871.07, plus interest at the rate of 8.25% per annum from and after December 3, 2004, plus the attorney fees incurred in this case. *Id.*

On July 8, 2003, Prime Time Mortgage Company received a letter from Paula Kingery of AmerUS Home Lending Company, a lender with whom Prime Time occasionally conducted business, demanding an explanation of the report on Prime Time's "broker status" with MARI. Upon inquiry, Tabib discovered that Flagstar had reported to MARI that Hoffacker and Prime Time had misrepresented the value of the Leland property and had engaged in a fraudulent property flip.

The MARI Report can be read as assuming that Hoffacker had somehow obtained from Frey an appraisal which deliberately overstated the value of the Leland property. Tabib Aff. at ¶ 15. Prime Time and Hoffacker contend that Clemens had obtained that appraisal himself and brought it to Hoffacker when referred to Prime Time by Thomas. Tabib Dep. at 45, lines 13-45; Hoffacker Dep. at 42, lines 10-25. Prime Time had never previously used Frey as an appraiser. Tabib Dep. at 45, lines 5-9; Frey Dep. at 49, lines 1-13. Prime Time and Hoffacker deny any knowledge of who actually ordered that appraisal. Tabib Aff. at ¶ 16; Hoffacker dep. at 44, lines 1-7.

On September 12, 2003, Rob Deters, an account representative for Interfirst Wholesale Mortgage Lending, the lender with whom Prime Time placed approximately eighty percent of its loans, contacted Tabib seeking an explanation of the MARI Report at issue. Tabib explained that

the information in the MARI Report was false. Nonetheless, Deters stated that unless the MARI Report was removed within three weeks' time, Interfirst would refuse to conduct further business with Prime Time. Tabib Aff. at ¶¶ 17 and 19; Tabib Dep. at 84, lines 1-11, 91, lines 17-25.

Approximately three weeks later, on October 1, 2003, Prime Time Mortgage Company initiated this lawsuit, seeking, *inter alia*, an injunction forcing MARI and Flagstar, to remove the MARI report. See Doc. 1. MARI removed the listing and was dismissed from this case with prejudice. Doc. 8.

Eventually, on November 17, 2003, Interfirst terminated its relationship with Prime Time. Tabib Aff. at ¶ 20; see Tabib Dep. at Ex. E, Doc. 59, Ex. V. In the 12 months prior to July 2003, Prime Time deposited an average of $146,524.12 per month in its account. In the 12 months after July 2003, that is, after Flagstar posted the MARI report, it deposited an average of $109,544.02 per month. Prime Time, thus contends that it has suffered a loss of income over the last year of $36,980.10 per month, or a total of $443,761.20. Tabib Aff. at ¶ 21; Tabib Dep. at 105-07, esp. 106, lines 4-16; see also 2002-04 bank statements, Tabib Dep. at Exs. G and G-1.

**II.     Standard of Review**

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor

of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250, 106 S. Ct. 2505 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 106 S. Ct. 1348 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324, 106 S. Ct. 2548.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255, 106 S. Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A

Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

The instant case involves questions of state law. When, as here, the parties fail to even consider the choice of law issue (all parties simply cite Ohio law), the substantive law of the forum state is presumed to govern. See *Massachusetts Bay Ins. Co. v. Vic Koenig Leasing*, 136 F.3d 1116, 1120 (7th Cir. 1998). In reviewing an Ohio claim, this Court must apply the law of Ohio, as interpreted by the Supreme Court of Ohio. *Northland Ins. Co. v. Guardsman Prods. Inc.*, 141 F.3d 612, 617 (6th Cir. 1998). Specifically, this Court must apply the substantive law of Ohio "'in accordance with the then-controlling decision of the highest court of the State.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir. 2001) (quoting *Pedigo v. UNUM Life Ins. Co.*, 145 F.3d 804, 808 (6th Cir. 1998). Also, to the extent that the highest court in Ohio has not addressed the issue presented, this Court must anticipate how Ohio's highest court would rule. *Id.* (quoting *Bailey Farms, Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994).

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

**III.    Analysis**

Flagstar's motion for summary judgment asserts that judgment should be entered in favor of Flagstar on Prime Time and Hoffacker's claim of defamation. The same motion further asserts that judgment should be entered in favor of Flagstar on it's counter-claim for breach of contract, as

Prime Time and Hoffacker refused to repurchase the Clemens loan in spite of three alleged breaches, any one of which Flagstar asserts merits the entry of judgment in its favor: the appraisal that Prime Time submitted with the loan failed to comply with industry standards, the loan application that Prime Time submitted was false, and Prime Time failed to disclose that the property at 724 Leland had been purchased six months earlier for less than half the value of the loan.  Prime Time and Hoffacker assert that the real estate appraisal submitted by Prime Time to Flagstar was not a "Mortgage Loan Document" under the agreement between the parties, and, then concludes that there is no warranty as to the truth and accuracy of the appraisal.  Prime Time and Hoffacker further assert that any breach of warranty regarding the veracity of the loan documents was not material, as they assert, Clemens would have qualified for the loan in any event.

Prime Time and Hoffacker's assertion that the appraisal was not a "loan document" simply ignores half of the contractual definition of Mortgage Loan Documents, which includes the "Closing Package," which Tabib admits includes the appraisal.  Agreement, Art. I.  The omission is, furthermore, material.  While Flagstar asserts that Clemens would have qualified for the loan in any event if it had been aware of Clemens' purchase of the Niagra property, what is uncontroverted is that determining this fact requires serious recalculation and consideration, albeit mechanical.  Moreover, Prime Time and Hoffacker make no effort to controvert the materiality of the failure to reveal the previous sale of the Leland property.  The inclusion of this information would have caused Flagstar, at least,  to seriously reconsider the acceptance of the loan, and is thus material.  Wherefore, the Court concludes that Prime Time and Hoffacker breached their duty to repurchase the Leland property, and judgment will be entered in favor of Flagstar on its counter-claim.

This leaves for the Court's consideration Prime Time and Hoffacker's claims of defamation. The elements of a defamation claim in Ohio are: (1) a false and defamatory statement concerning another; (2) an unprivileged publication of the statement to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) either actionability or the existence of special harm caused by the publication. *Akron-Canton Waste Oil v. Safety-Kleen Oil Servs.*, 611 N.E.2d 955 (Ohio App. 1992). Here, Prime Time and Hoffacker allege that they were defamed in the report Flagstar sent to MARI. Regardless of whether Flagstar claimed that Prime Time and Hoffacker *intentionally* misrepresented the appraisal value of the Leland property, or that they failed to report the flip of the property, Plaintiffs cannot establish a claim for defamation because Flagstar's publication of these statements were covered by a qualified privilege.

Ohio recognizes a qualified privilege to publish an alleged defamatory statement if (1) it is made in good faith; (2) with an interest to be upheld; (3) limited in scope to its purpose; (4) at a proper occasion; and (5) published in a proper manner to proper parties. *Hanley v. Riverside Methodist Hosp.*, 603 N.E.2d 1126, 1131 (Ohio App. 1991). Where a qualified privilege exists, a plaintiff must show actual malice on the part of the defendant by clear and convincing evidence. *Blatnik v. Dennison*, 774 N.E.2d 282, 291 (Ohio App. 2002). In the defamation context there is malicious purpose when a defendant makes a statement with knowledge that the statement is false or with reckless disregard of whether it was false. *Smith v. Klein*, 492 N.E.2d 852, 855 (Ohio App. 1985); *Costanzo v. Gual*, 403 N.E.2d 979, 983 (Ohio 1980). There must be sufficient evidence to permit the conclusion that the defendant had serious doubts as to the truth of his publication. *A & B Abell Elevator Co. v. Columbus/Central Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283 (Ohio 1995), *Condit v. Clermont Co. Review*, 638 N.E.2d 96, 101 (Ohio 1994).

Prime Time and Hoffacker, apparently conceding the good faith evinced by Flagstar's acquisition of an additional appraisal, only contest whether Flagstar and MARI had an interest to be upheld.  Prime Time and Hoffacker do not rebut, however, that Flagstar and MARI share the interest of providing to subscribers of MARI, who include Flagstar, information concerning mortgage professionals with whom they do business in an effort to prevent fraud.  Daley Decl. at ¶ 11.  Flagstar and the other mortgage lenders who utilize MARI share the common interest of reporting those who engage in suspect transactions, so as to allow an extra caution in dealing with these individuals.  *Id.* at ¶12.  Because Flagstar and MARI share an interest in the publication, and because the statement was limited in scope to this purpose at a proper occasion and publication was made in a proper manner to proper parties, judgment will be entered in favor of Flagstar on Prime Time and Hoffacker's defamation claim.

### IV.  Conclusion

Because Flagstar's statement to MARI was qualifiedly immune and because Prime Time and Hoffacker failed to fulfill their warranties to Flagstar, Flagstar Bank, FSB's Motion for Partial Summary Judgment, Doc. 53, is **GRANTED**.  Plaintiffs' Complaint is **DISMISSED** with prejudice. Flagstar is granted judgment as a matter of law on its First Claim for Relief of the Amended Counterclaim against Prime Time, in the amount of $39,871.07 plus interest accruing at the rate of 8.25% from and after December 3, 2004.  Under Article IV of the agreement, Flagstar is also entitled to attorneys' fees and costs.  The amount of attorney's fees and costs, as well as Flagstar's second and third claims for relief, remain for adjudication.

**DONE** and **ORDERED** in Dayton, Ohio, on Wednesday, May 4, 2005.

                                        s/Thomas M. Rose

                                        _____

                                            THOMAS M. ROSE
                                    UNITED STATES DISTRICT JUDGE